IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| JUDY BLACKBURN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:07-cv-02815-JPM-dkv |
| | ) | |
| SHELBY COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE**

Pending before the Court is Defendant Shelby County's ("Defendant") Motion for Summary Judgment (Docket Entry ("D.E.") 67), filed June 7, 2010.[1] On June 26, 2010, Plaintiff Judy Blackburn ("Plaintiff") filed a response in opposition (D.E. 70).[2] On July 12, 2010, Defendant replied to Plaintiff's response and moved the Court to strike portions of Plaintiff's response. (D.E. 87.) Plaintiff responded to Defendant's Motion to Strike on July 26, 2010. (D.E. 88.)

For the following reasons, the Court GRANTS Defendant's Motion for Summary Judgment. Defendant's Motion to Strike is

---

[1] Defendant attached its Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem.") and its Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Def.'s UMF") to the Motion for Summary Judgment. (See D.E. 67-1; D.E. 67-2.)

[2] Plaintiff also filed a Response to Defendant's Statement of Undisputed Material Facts (Pl.'s Resp. to Def.'s UMF) (D.E. 71 at 1-34) in which she included a section titled "Plaintiffs' [sic] Enumerated Material Facts." (D.E. 71 at 34-53).

DENIED as MOOT.

## I. PROCEDURAL BACKGROUND

This case arises out of Plaintiff's employment with the Shelby County Sheriff's Office ("SCSO" or "Defendant"). Plaintiff is a fifty-four year old female Sergeant with the SCSO.  She asserts claims for sex discrimination, age discrimination, hostile work environment, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 et seq. Plaintiff also asserts a state law claim for intentional infliction of emotional distress.

Plaintiff filed two separate complaints against Defendant, the first on December 18, 2007 with facts related to her first EEOC charge (D.E. 1), and the second on August 29, 2008 with facts related to her second EEOC charge (D.E. 1 in Case No. 2:08-cv-02565-JPM-egb).  On May 18, 2009, the Court consolidated these cases. (D.E. 17.) On July 29, 2009, Plaintiff filed an Amended Complaint, consolidating the allegations from her separate complaints and including facts related to her third EEOC charge.  (See generally Am. Compl. (D.E. 25).)

Defendant now moves for summary judgment on all of Plaintiff's claims.  (Def.'s Mem. 1, 25.)

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989). In considering a motion for summary judgment, however, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly supported motion for summary judgment, the nonmovant must support the assertion that a genuine dispute exists as to one or more material facts by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the

> absence . . . of a genuine dispute, or that an adverse
> party cannot produce admissible evidence to support
> the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B); see also Abeita v. TransAm.
Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998).  However,
"'[t]he mere existence of a scintilla of evidence in support of
the plaintiff's position will be insufficient.'"  Street v. J.C.
Bradford & Co., Inc., 886 F.2d 1472, 1479 (6th Cir. 1989)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252
(1986)).

A genuine issue of material fact exists for trial "if the
evidence [presented by the nonmoving party] is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248.  The inquiry is "whether the evidence
presents a sufficient disagreement to require submission to a
jury or whether it is so one-sided that one party must prevail
as a matter of law."  Id. at 251-52.

## III. FACTUAL BACKGROUND

Plaintiff's allegations center around three EEOC charges.
The Court addresses these allegations in turn.

### A. Allegations Arising from First EEOC Charge

Plaintiff began her employment with the SCSO as a deputy
sheriff in 1987. (Pl.'s Resp. to Def.'s UMF ¶ 1.)  Plaintiff was
promoted to the rank of Sergeant in February 1997.  (Id. ¶ 2.)
After successive assignments to the Narcotics Division from 1992

to 1997, the Internal Affairs Division in 1997, and the
Detectives Division from 1997 to 2000, Plaintiff was transferred
to the Narcotics Division as the Case Management Sergeant ("CM
Sergeant") on October 26, 2000. (Dep. of Judy Blackburn, March
19, 2010 ("March Dep.") (D.E. 67-4) 28-29; Pl.'s Resp. to Def.'s
UMF ¶¶ 11-13.) Plaintiff held the position of CM Sergeant in the
Narcotics Division until April 22, 2006. (Id. ¶ 15.)

     The Narcotics Division is divided into enforcement teams
and specialized units that provide support for the enforcement
teams, including the Equipment/Technical Unit, the
Seizure/Forfeiture Unit, the Intelligence Unit, and the Case
Management and Clerical Support Unit. (Pl.'s Resp. to Def.'s UMF
¶ 4.) Each of these support units is supervised by a sergeant.
(Id.) The position of Case Management Sergeant, to which
Plaintiff was transferred in 2000, supervises the Case
Management and Clerical Support Unit. (Id. ¶ 5; Def.'s Ex. No.
D454.[3]) As the CM Sergeant for the Narcotics Division, Plaintiff
was in a support position, responsible for the case tracking
system, narcotics state prosecutorial cases, internal clerical

---

[3]      For ease of reference to the large number of exhibits Defendant
attached to its Motion for Summary Judgment, the Court will cite to the Bates
number in the lower right hand corner of Defendant's exhibits. ("Def.'s Ex.
No.") The exhibits are docketed as exhibits to Defendant's Motion for Summary
Judgment and Defendant's Reply: Bates number D110-D184 (D.E. 67-6); Bates
number D193-D259 (D.E. 67-7); Bates number D271-D296 (D.E. 67-8); Bates
number D297-D321 (D.E. 67-9); Bates number D326-D351 (D.E. 67-10); Bates
number D352-D376 (D.E. 67-11); Bates number D377-D399 (D.E. 67-12); Bates
number D400-D427 (D.E. 67-13); Bates number D428-D457 (D.E. 87-2); Bates
number D458-D478 (D.E. 87-3).

operations of the narcotics division, and the supervision of the civilian secretarial staff. (Pl.'s Resp. to Def.'s UMF ¶¶ 8, 16.) The job description for CM Sergeant lists sixteen additional duties, the last of which is: "Available for Narcotic Enforcement Duties." (Def.'s Ex. No. 454.)

Plaintiff's allegations of sex and age discrimination in her first EEOC complaint arise from her assignment to the Narcotics Division as the CM Sergeant under the supervision of Lieutenant David Ducrest ("Lt. Ducrest"), the Executive Officer, and Captain Wayne Goudy ("Capt. Goudy"), the Commanding Officer.[4] (April 26, 2006 EEOC Charge No. 490-2006-01126 ("First EEOC Charge") (D.E. 25-1); Pl.'s Resp. to Def.'s UMF ¶ 23; David Ducrest's Verified Statement ("Ducrest Statement") (D.E. 67-3) ¶ 14.)

Prior to June 2005, Plaintiff was often permitted to perform enforcement duties and go out on special details. (Pl.'s Resp. to Def.'s UMF ¶ 32.)  After Capt. Goudy was assigned to Narcotics in June 2005, however, Plaintiff alleges her requests to participate on special details or to help as extra manpower for enforcement duties were denied and ignored. (Aff. of Pl. Judy Blackburn ("Blackburn Aff.") (D.E. 71-1) 1; Pl.'s Resp. to Def.'s UMF ¶ 32.) Plaintiff identified three instances when her

---

[4]     Plaintiff's immediate supervisor in Narcotics was Lt. Ducrest.  Lt. Ducrest reported to Capt. Goudy. (Def.'s UMF ¶ 23.) Capt. Goudy reported to Inspector Bill Allen ("Insp. Allen"), the commander of Special Operations. (Id.)

requests were denied: a federal roundup on October 25, 2005, a
saturation on February 17, 2006, and a federal roundup on March
22, 2006.[5] (Pl.'s Resp. to Def.'s UMF ¶¶ 33, 36.) On another
occasion, when Lieutenant Richard Nelson ("Lt. Nelson") asked
Lt. Ducrest if Plaintiff could fill in for an enforcement team
member who was going to be out for the week, Lt. Ducrest said
no, explaining that Chiefs Odom and Wing would have a "fit" if
they found out that Lt. Nelson had a "sergeant over the
secretaries" out there. (Pl.'s Resp. to Def.'s UMF ¶ 45;
Blackburn Aff. 4-5.)  Plaintiff alleges that, on other
occasions, she was given excuses such as "[y]ou're too old to
ride with the cowboys," "you'll get dirty," or "you might have a
heart attack." (Blackburn Aff. 3.) On each of the dates
Plaintiff alleges she was denied enforcement duties, she worked
a regular eight-hour shift performing her duties as the CM
Sergeant. (Pl.'s Resp. to Def.'s UMF ¶ 38.)

Between December 2005 and February 2006, Plaintiff alleges
she was denied training opportunities that other male sergeants
were given, including supervisory management training in
December 2005 and meth training in February 2006. (Am. Compl. 4;
First EEOC Charge.) According to Plaintiff, though she requested

---

[5]     Though Plaintiff also alleges that she was denied the opportunity to
participate in an ALERT ("Area Law Enforcement Retailers Team") search
warrant on January 11, 2006 (Pl.'s Resp. to Def.'s UMF ¶¶ 33, 36), Defendant
produced competent evidence that no patrol officers or sergeants assigned to
the Narcotics Division worked on an ALERT search warrant on that date.
(Ducrest Statement ¶¶ 26-39).

to participate in training exercises that would have kept her enforcement tactics up to date, her requests were denied. (Blackburn Aff. 4.)

Plaintiff also alleges that she was "denied proper supervisory evaluation process by Lt. Ducrest and Capt. Goudy." (Blackburn Interrogs. Resp. 4.) According to Plaintiff, her "supervisory issues regarding clerical personnel were not supported and in fact ignored" even though "[o]ther male supervisors of Plaintiff's rank were given full attention for their units." (Am. Compl. 5; Blackburn Aff. 2-3; Blackburn's Interrogs. 3-4.)

In February 2006, Plaintiff went to the Special Operations Office to meet with Insp. Allen. (March Dep. 130.) Plaintiff was very upset and explained to Insp. Allen that she was upset over the way she was being treated in the Narcotics Division. (Id. 130-31.) She also expressed her unhappiness about her supervisory and case management problems, and the unfair treatment she felt she was receiving. (Id. at 131.) Though she did not make a direct request for curative action, Plaintiff did tell Insp. Allen that she would not have come to him if she did not want him to fix all the problems she was having in the Narcotics Division. (Id.)

Around March 28, 2006, Plaintiff had a meeting with Lt. Ducrest in which she complained about her working conditions.

(March Dep. 141.)  She informed Lt. Ducrest that she felt she was being pushed out and ignored and "if they didn't want [her] there then all they had to do was tell [her]" and "[she] would ask for a transfer or they could transfer [her] out; one means or the other." (Id. at 141, 178.) Lt. Ducrest responded "okay" and told Plaintiff to put in a transfer request. (Id. at 141.) Following the meeting, Plaintiff did not put in for a transfer, but instead requested a meeting with Insp. Allen and Capt. Goudy. (Id.) Lt. Ducrest contends that, during this meeting, Plaintiff indicated that she wanted to transfer out of Narcotics. (Ducrest Statement ¶ 68.)  Lt. Ducrest conveyed this information to Insp. Allen and Capt. Goudy. (Id.)

In the week preceding April 17, 2006, Lt. Ducrest approached Sergeant Ray Collier ("Sgt. Collier") and asked if Sgt. Collier was willing to swap his position in the Detectives Division with Plaintiff. (Pl.'s Resp. to Def.'s UMF ¶ 28.) Sgt. Collier responded that he would be glad to take the position of CM Sergeant. (Id.) Lt. Ducrest advised his superiors of Sgt. Collier's willingness. (Id.)

On April 17, 2006, Plaintiff met with Lt. Ducrest, Capt. Goudy, and Insp. Allen. (Ducrest Statement ¶ 69.) Plaintiff informed her supervisors that she could not continue working under the same conditions in Narcotics Division.  (March Dep. 178.)  She admits that it is possible that she discussed a

transfer during that meeting and referred back to her previous statement that "if they didn't want [her] there, [she] would ask for a transfer or they could transfer [her] out." (Id.) During this meeting, Capt. Goudy stated to Plaintiff: "If my dog has a problem, I take him to a vet. You've got a problem. You need to see somebody." (Id. at 153.)

On April 19, 2006, Lt. Ducrest gave Plaintiff a transfer letter dated April 18, 2006, notifying Plaintiff that she was being swapped with Sgt. Collier and being reassigned to the Detectives Division effective April 22, 2006. (Def.'s Ex. No. 421; Blackburn Interrogs. 4.) Plaintiff alleges that she was demoted to the Detectives Division and put in a less appealing position. (Am. Compl. 6; Pl.'s Resp. 5.)

On April 26, 2006,[6] Plaintiff filed her First EEOC Charge, bringing claims of sex discrimination and age discrimination, and identifying the following alleged discriminatory conduct: (1) being denied the opportunity to work on special details and perform enforcement duties; (2) being denied training opportunities; (3) being denied proper supervisory assistance;

---

[6]    Plaintiff insists that she filed her First EEOC Charge on April 18, 2006, before she was notified of her transfer out of the Narcotics Division. (Blackburn Interrogs. 4; Sept. 19, 2007 Amendment to EEOC Charge No. 490-2007-00633 ("Am. to Second EEOC Charge") (D.E. 25-1) 2; Blackburn Aff. 3.) However, the date on her First EEOC Charge states that Plaintiff brought her first charge of discrimination on April 26, 2006. (First EEOC Charge.) Thus, the Court finds that her transfer to the Detectives Division, effective April 22, 2006, occurred before Plaintiff filed a charge of discrimination with the EEOC.

and (4) being involuntarily transferred to the Detectives
Division. (First EEOC Charge.)

## B. Allegations Arising from Second EEOC Charge and Amendment to Second EEOC Charge

Plaintiff's allegations of sex and age discrimination,
retaliation, and hostile work environment in her Second EEOC
Charge and the Amendment to her Second Charge arise from her
assignment to the Detectives Division from April 2006 to August
2006 and her assignments within the Courts Division from August
2006 to September 2007. (Dec. 5, 2006 EEOC Charge, No. 490-
2007-00633 ("Second EEOC Charge") (D.E. 25-1); Am. to Second
EEOC Charge.)

While in the Detectives Division, Plaintiff reports that
she was shunned by co-workers and the command staff, and
experienced "daily feelings of being monitored." (March Dep.
177.)  She was told her whereabouts had to be accounted for at
all times, and she was not permitted to leave the office
unaccompanied by a partner. (Id. at 186-87.) On July 11, 2006,
Plaintiff met with Inspector McEachran and Captain Cobb,
reporting that she felt harassed because of her EEOC charge and
"job related issues." (Blackburn Interrogs. 6.) In response,
Inspector McEachran purportedly stated that it was all in
Plaintiff's head. (Id.)

On August 10, 2006, Plaintiff submitted a letter requesting

reassignment from the Detectives Division due to "personal health reasons." (Pl.'s Resp. to Def.'s UMF ¶ 65.)  On August 22, 2006, Chief Oldham granted Plaintiff's transfer request and reassigned her to the General Sessions Criminal Courts Division (the "Criminal Courts Division").  (Id. ¶ 66.)  Though she requested a reassignment, Plaintiff was unhappy that it was to the Criminal Courts Division and felt that she was being punished by her placement there. (April Dep. 29.)  According to Plaintiff, the Criminal Courts Division is known as a punishment area and referred to as the "whipping post." (Id. at 46.)  Plaintiff admits, however, that as with any position within the SCSO, there are sergeants who like the Criminal Courts Division and sergeants that do not. (Pl.'s Resp. to Def.'s UMF ¶ 67.)

Plaintiff's supervisor in the Criminal Courts Division was Lieutenant Larry Hill ("Lt. Hill"), the General Sessions Criminal Courts Commander.  On August 30, 2006, Plaintiff had a discussion with Lt. Hill regarding the details of her transfer to the Criminal Courts Division, in which she informed him of her first EEOC charge. (Blackburn Interrogs. 7.)

Shortly after her reassignment, Plaintiff reports that Lt. Hill began to treat her unfairly.  On one occasion, Lt. Hill ordered Plaintiff to put her gun belt back on after she took it off to clean the area under her desk, advising that it was a safety factor. (April Dep. 43-44.) On another occasion, Lt. Hill

called a meeting with Plaintiff and two other sergeants in which
he raised his voice and unjustly chastised her. (Blackburn
Interrogs. 8.) When Plaintiff began to cry, Lt. Hill accused her
of being unprofessional. (Id.) According to Plaintiff, Lt. Hill
treated her unfairly because Plaintiff had become a target based
on her EEOC complaint and Lt. Hill wanted to ingratiate himself
to Chief Young and get a promotion. (Id. at 44-45.)

On October 16, 2006, Captain Terry Yarbrough ("Capt.
Yarbrough") was assigned to the Courts Division as the Courts
Division Commander. (Blackburn Interrogs. 8; Def.'s Ex. No.
202.) On October 17, 2006, Plaintiff had a conversation with
Chief Young about work related issues and her EEOC charge.
(Blackburn Interrogs. 8.)

On October 26, 2006, Plaintiff was suspended for one day
without pay for violation of "SOR 111 Disobedience of an Order"
after disobeying a direct order from Lt. Hill. (Def.'s Ex. No.
D180). The disciplinary action arose out of a meeting on
October 24, 2006 in which Lt. Hill advised Plaintiff, Sergeant
R. Harrison, and Sergeant S. Jones that Capt. Yarbrough had
issued a disciplinary directive requiring supervisors to address
officers under their command that had been off sick without pay
without any disciplinary action. (Id. at D181.) Lt. Hill
instructed Plaintiff to complete a disciplinary action form for
Patrolwoman Robin Lee ("Ptlw. Lee") for violation of A.W.O.L.-

SOR 1105.  (Id.) In response, Plaintiff "respectfully expressed questions concerning medical documentation and short term disability procedures set forth in the SCSO Policy." (Id. at D193.)  In Plaintiff's opinion, Ptlw. Lee had followed proper procedures for her sick leave and had not violated the A.W.O.L. policy. (Id.) When she did not get a satisfactory response from Lt. Hill regarding her concerns, she refused to proceed with the disciplinary action. (Id.) Lt. Hill then delegated the disciplinary action directive to Sergeant Harrison, who completed the write up. (Id. at D182.)

Plaintiff contends that the write-up was false because she did not refuse the command; rather, she explains that she asked questions regarding an order, per policy SOR 106.12 G. (April Dep. 56; SOR 106.12(G) (D.E. 78).)

After receiving the disciplinary action write-up, Plaintiff hand-delivered a memo to Lt. Hill, requesting an administrative hearing regarding the disciplinary action. (Def's Ex. No. D194, D183.) Lt. Hill reported to Capt. Yarbrough that, upon handing Lt. Hill the memo, Plaintiff stated that she was going to ask for an internal investigation and file a complaint for hostile work environment. (Id. at D183.) On October 27, 2006, Lt. Hill sent Capt. Yarbrough a memo requesting that Plaintiff be transferred from under his command. (Id. at D184.) Lt. Hill explained that he was "taking a proactive approach in [sic]

attempt to alleviate any negligence on behalf of the Sheriff's office, as well as for myself being in an administrative position where any legal proceedings may arise; whether factual or frivolous from Sgt. Blackburn's actions." (Id.)

After an administrative line-level hearing on November 21, 2006, Capt. Yarbrough sustained the infraction as charged. (Id. at D201.) Although the Disciplinary Action Form memorializing her suspension for one day without pay is still in her personnel file, Plaintiff has never been suspended without pay nor has her pay ever been docked as a result of the disciplinary action. (April Dep. 56-57, 64.)

Immediately following the hearing, Plaintiff hand-delivered a memo dated November 20, 2006, to Chief Young's office, requesting an official grievance investigation and complaining of the "antagonistic work environment and harassing behavior" directed towards her by Lt. Hill. (Def.'s Ex. No. D200, D202-D203.) This was the first time that Plaintiff had complained to management regarding Lt. Hill's behavior. (Id. at D204.)

After further investigation, Capt. Yarbrough concluded that Plaintiff's grievance accusations of an antagonistic work environment and harassment were without support. (Def.'s Ex. No. D202.) After reviewing the file, Asst. Chief Young and Chief Deputy Oldham concurred. (Id. at D204, D206.)

In November 2006, Plaintiff alleges that her Shelby County

Employee Assistance Program ("EAP") benefits were terminated. Around January 2006, Plaintiff went to the EAP to seek assistance and was given some forms to fill out, including a release for medical information. (April Dep. 107.) Plaintiff refused to sign the release form because she was seeking treatment for work-related issues and she did not want information released to the SCSO regarding her visits. (Id.) Plaintiff received treatment from Jane Cox, PhD, until November 2006, when a review of her Plaintiff's EAP file revealed that Plaintiff declined to sign the initial authorization form for treatment. (Def.'s Ex. No. D199.) By letter dated November 6, 2006, the EAP informed Dr. Cox that the treatment authorization dated January 18, 2006 for Plaintiff was terminated and that no further sessions were authorized. (Def.'s Ex. No. D197.) On November 20, 2006, Plaintiff sent a letter to the EAP, asking for an explanation as to why her benefits were terminated. (Id. at D198.) Plaintiff received a response dated November 22, 2006, explaining that an authorization for treatment could not be processed without Plaintiff's signature and, though she could seek a new authorization for treatment, she would be required to sign the authorization form for Dr. Cox to provide information to the EAP if the sessions were going to be billed to Plaintiff's county insurance. (Id. at D199.) When Plaintiff later learned that Dr. Cox was not employed by Shelby County,

she contacted CIGNA and resumed her therapy under her own insurance. (April Dep. 108.)

In November 2006, Plaintiff went on FMLA sick leave. (Blackburn Interrogs. 9.) Plaintiff alleges that Lt. Hill instructed her to call in sick every day during the duration of her sick leave. (Id.)  According to Plaintiff, this practice is not enforced with other officers. (Id.)

On December 5, 2006, Plaintiff filed her second EEOC Charge, bringing a claim of retaliation, and identifying the following alleged retaliatory conduct occurring between August 8, 2006 and October 26, 2006: (1) transfer to the Courts Division; and (2) suspension for one day without pay. (Second EEOC Charge.)

On February 6, 2007, Plaintiff asked to be transferred out of the Courts Division.  (Blackburn Interrogs. 9.) Chief Young informed Plaintiff in the presence of Capt. Yarbrough that Chief Oldham would not sign a transfer for Plaintiff, stating that "he had me because no one else wanted me." (Id.) On July 23, 2007, Plaintiff received her first denial to work "Special Detail FSS."[7] (Blackburn Interrogs. 9.) She received her second denial

---

[7]     The only place that Plaintiff alleges she was denied "Special Detail FSS" is in her interrogatory responses. (Blackburn Interrogs. 9.)  Plaintiff offers no evidence of what this assignment was, whether it included a permanent reassignment or a temporary special detail, whether she applied for the position for which she was qualified, and whether the assignment would have involved an increase in rank, pay, or benefits.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

on October 4, 2007.  (<u>Id.</u>)

In July 2007, Plaintiff received a low performance evaluation from Lt. Hill "without evidence of any negative OBR."[8] (Blackburn Interrogs. 9.) The previous month, Plaintiff received a positive OBR from Lt. Hill in which "he was singing [her] praises as a supervisor." (<u>Id.</u>; April Dep. 119.) According to Plaintiff, prior to her performance evaluation in 2007, she had always received "exceeds expectations" on her evaluations. (April Dep. 104.)  Plaintiff admits that her performance evaluations have not caused her to lose any pay increases.[9] (April Dep. 104.) She also testified that, during the relevant time period, she never sought a promotion with SCSO that she did not obtain. (March Dep. 29.)

Plaintiff testified that, in August 2007, Lt. Hill instructed Plaintiff not to call him "sir." (April Dep. 170.) According to Plaintiff, this was "just another way to degrade [her]."  She testified that "[t]hey just looked for things. . . . They look[ed] for stupid things all day long to needle me with, to call me on the carpet about. Just silly little things

---

insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 252.

[8]    Neither party has explained to the Court the evaluation process or how an "OBR" differs from a performance evaluation.

[9]    In her response to Defendant's UMF, Plaintiff states: "Performance evaluations have caused her to lose chance [sic] at promotion. This would then be a loss in opportunity for increased pay." (Pl.'s Resp. to Def.'s UMF ¶ 83.) A party may not create a factual dispute by filing an affidavit or a pleading which contradicts earlier deposition testimony. <u>Reid v. Sears, Roebuck & Co.</u>, 790 F.2d 453, 460 (6th Cir. 1986).

that don't mean nothing." (Id. at 171.)

Plaintiff reviewed her personnel file in August 2007 and saw derogatory letters from the command staff related to the October 26, 2006 disciplinary action and subsequent investigation. (Blackburn Interrogs. 10.) These included the letter from Lt. Hill asking that Plaintiff be transferred out of Courts Division, and one or two letters from Capt. Yarbrough. (April Dep. 174-175; Def.'s Ex. No. D184, D201-D203.)  Plaintiff complains that she was never advised that these letters were placed in her file, even though she is supposed to be advised of anything that is placed in her file. (Id. at 175.)

On September 19, 2007, Plaintiff filed an amendment to her second EEOC Charge, bringing claims of sex discrimination, age discrimination, retaliation, and hostile work environment and identifying the following additional discriminatory and retaliatory conduct: (1) abusive and hostile work environment, including constant criticism and reprimands; (2) exclusion from special divisions training; (3) termination of EAP benefits; (4) lowered performance evaluation; (5) denial of transfer requests; and (6) damage to personnel file. (Am. to Second EEOC Charge.) This amended charge also identified conduct occurring while Plaintiff was in the Narcotics Division that was not alleged on the first or second EEOC complaints.  Specifically, Plaintiff alleged that, while assigned to the Narcotics Division, she was

denied "overtime pay," told on several occasions that she was "too old" for enforcement duties, compared to a "dog with a problem," "called upon to organize and shop for Division parties," and called upon to do "office cleaning and bathroom cleaning in the absence of cleaning crew." (Am. to Second EEOC Charge.") As discussed _infra_, Part IV.A., claims based on conduct not alleged in Plaintiff's first EEOC charge are time-barred if they are not reasonably related to the discriminatory conduct stated in the charge.[10]

### C. Allegations Arising from Third EEOC Charge

Plaintiff's allegations of sex and age discrimination, retaliation, and sexual harassment in her Third EEOC Charge arise from her continued assignment to the Courts Division from February 27, 2008 to September 2, 2008. (Sept. 2, 2008 EEOC Charge, No. 490-2008-03183 ("Third EEOC Charge") (D.E. 25-1).)

On October 17, 2007, Plaintiff submitted a transfer request to Lt. Hill for transfer out of the Criminal Courts Division. (Def.'s Ex. No. D227.) Lt. Hill notified Plaintiff by memo dated October 23, 2007 that, after discussion with Chief Young and

---

[10]     Plaintiff also alleged that Chief Wing, the Commander over Narcotics at the time, referred to Plaintiff as a "secretary" to Inspector Floyd Bonner. (March Dep. 150; Blackburn Aff. 4.) Plaintiff did not hear Chief Wing make this statement, but heard about it later from someone who was present. (Pl.'s Resp. to Def.'s UMF ¶ 54.) The Court declines to consider this evidence.  First, it is hearsay evidence that may not be considered on a motion for summary judgment. Wiley v. U.S., 20 F.3d 222, 226 (6th Cir. 1994). Second, this statement occurred around January 2004, outside the relevant period stated on the First EEOC Charge and before the alleged discrimination began. (See First EEOC Charge; Def.'s Ex. No. 445.)

Capt. Yarbrough, her transfer request was denied because
Plaintiff's performance evaluation indicated areas for
improvement and there were problems with her attendance record.
(Id. at D233.)

On or around February 27, 2008, Plaintiff met with Capt.
Yarbrough and Capt. Hill.  Both Plaintiff and Capt. Hill were
expressing some complaints when Capt. Yarbrough turned to
Plaintiff and stated: "Sergeant Blackburn, what is it that you
want? . . . [Y]ou want to be fixed up[?] I can fix you up."
(March Dep. 50.) Plaintiff responded, "[I]f you're referring to
a date, I have a personal life away from this place." (Id. at
51.) Plaintiff testified that she was so surprised by Capt.
Yarbrough's comments that she began to cry. (Id.) Capt.
Yarbrough then asked Plaintiff if she had lunch and, when
Plaintiff said no, he asked Plaintiff if she wanted him to take
her to lunch. (Id.) As the meeting was concluding and everyone
was leaving, Capt. Yarbrough stated: "[W]e all need to be, you
know, just wipe the slate clean. We all need to be friends here
and who knows, maybe someday we will all be doing the bump
together." (Id.) Capt. Yarbrough then started "bumping his rear
end up against . . . Lt. Hill's desk." (Id.) Plaintiff retrieved
her purse and immediately left the office. (Id.) In her
deposition testimony, Plaintiff explained that she did not
interpret Capt. Yarbrough's reference to "the bump" as referring

to anything other than the dance. (March Dep. 52.) Plaintiff
explains, however, that the dance is sexual in nature,
inappropriate for work, and made Plaintiff uncomfortable. (Pl.'s
Resp. to Def.'s UMF ¶ 89.)

On May 20, 2008, Plaintiff requested a meeting with a
member of the SCSO's Sexual Harassment Prevention Team ("SHPT")
in order to file a formal complaint regarding offensive behavior
by Capt. Yarbrough during the February 27, 2008 meeting. (Def.'s
Ex. No. D241.) The SHPT informed Plaintiff that the Bureau of
Professional Standards and Integrity ("BPSI") would investigate
her complaint. (Pl.'s Resp. to Def.'s UMF ¶91.) At the
conclusion of the BPSI's investigation, Detective Janice Masters
issued a report outlining her findings and recommending that no
action be taken against Capt. Yarbrough. (Id. ¶ 92; Def.'s Ex.
No. D247-D250.)

In June 2008, Plaintiff asked to be considered for
reassignment to the FBI Civil Rights/Human Trafficking Task
Force.[11] (Def.'s Ex. No. D457.) Plaintiff complains that she was
never considered for the position. (Pl.'s Resp. to Def.'s UMF ¶
96.) The SCSO never received FBI funding for the assignment and,
as a result, the SCSO never selected an officer for assignment

---

[11]    In Plaintiff's Third EEOC Charge, she alleges that she filed a transfer
request on March 28, 2008, which was denied. (Sept. 2, 2008 EEOC Charge.)
Plaintiff has presented no competent evidence in support of this allegation.
The Court construes Plaintiff's allegation as referring to either or both
Plaintiff's October 2007 and June 2008 transfer reqests which were denied.

to the task force.  (Richard H. Sherman's Verified Statement
("Sherman's Statement") (D.E. 67-3) ¶ 20.)

On September 1, 2008, Plaintiff was transferred to the
Civil Courts Division, an assignment that Plaintiff was
initially pleased with. (Pl.'s Resp. to Def.'s UMF ¶ 97.) On
June 18, 2009, however, Capt. Yarbrough was assigned as Courts
Commander and, according to Plaintiff, he "picked up where he
left off" harassing her. (Blackburn Interrogs. 11.)

On September 19, 2008, Plaintiff filed her third EEOC
Charge, bringing claims of sex and age discrimination,
retaliation, and sexual harassment and identifying the following
discriminatory, retaliatory, and/or harassing conduct: (1) Capt.
Yarbrough's conduct during the February 27, 2008 meeting; and
(2) denial of her transfer request.

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies

As a preliminary matter, the Court must determine whether
Plaintiff failed to exhaust her administrative remedies on
certain of her allegations of discrimination while in the
Narcotics Division.

Defendant argues that Plaintiff failed to exhaust her
administrative remedies on her discrimination in denial of
overtime claim because the first time she alleged it was in the
Amendment to the Second EEOC Charge, on September 19, 2007, more

than sixteen months after she was allegedly denied overtime in the Narcotics Division. (Def.'s Mem. 17-18.) Plaintiff counters that her denial of overtime claim is reasonably related to the claims in her first charge because the performance of enforcement duties is how officers get overtime.[12] (Pl.'s Resp. 7.) Thus, Plaintiff argues that her allegation that she was denied enforcement duties is, in effect, an allegation that she was denied overtime. (Id.)

The exhaustion of administrative remedies is a prerequisite to filing a lawsuit alleging discrimination under Title VII of the Civil Rights Act of 1964. See Brown v. Gen. Servs. Admin., 425 U.S. 820, 823-33 (1979); Williams v. Northwest Airlines, 53 F. App'x 350, 351 (6th Cir. 2002). To exhaust administrative remedies, an aggrieved person in a deferral state such as Tennessee must file a formal charge of discrimination with the EEOC or the Tennessee Human Rights Commission within three hundred (300) days of the allegedly discriminatory action. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(2). Once the EEOC dismisses the charge and issues a right-to-sue letter, the plaintiff has ninety (90) days to file a civil action. 42

---

[12]    Plaintiff contends that "[i]t is undisputed that performance of enforcement duties is how a Sergeant gets overtime in the Narcotics Division." (Pl.'s Resp. 7.) Plaintiff offers no competent evidence supporting this conclusory allegation. Gregg v. Allen-Bradley Co., 801 F.2d 859, 861 (6th Cir. 1986) (noting that the "nonmoving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint").

U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(e).  This procedure notifies potential defendants of the nature of the plaintiff's claims and provides them with the opportunity to settle claims before the EEOC rather than litigate them. Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998). Conciliation serves an important purpose and is not to be easily circumvented. Vinson v. Ford Motor Co., 806 F.2d 686, 688 (6th Cir. 1987).

The Supreme Court held in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002), that "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113. Therefore, "[a] party must file a charge within either 180 or 300 days of the date that a discrete retaliatory or discriminatory act 'occurred' or lose the ability to recover for it." Id. at 102.  If the employee fails to file an EEOC complaint related to that action within the allowed statutory period, a defendant employer is entitled to treat a past act as lawful. See United Air Lines v. Evans, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis of a timely charge is the legal equivalent of a discriminatory act that occurred before the statute was passed . . . . [S]eparately considered, it is merely an unfortunate event in history which has no present legal consequences.")

The EEOC regulations, however, expressly provide that "[a] charge may be amended to cure technical defects or omissions, including . . . to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." 29 C.F.R. § 1601.12(b).

Plaintiff's first EEOC charge, filed on April 26, 2006, brings claims of sex discrimination and age discrimination, and alleges, inter alia, that Plaintiff was not "allowed to work on Special Details (Round-ups; Federal warrants; serving warrants)" or "to go out and perform enforcement duties" between July 2005 and March 22, 2006. (First EEOC Charge.) It does not mention discrimination in the denial of overtime.

Plaintiff's second EEOC charge, filed on December 5, 2006, brings a claim of retaliation and alleges that, between August 28, 2006 and October 26, 2006, Plaintiff "was transferred to an undesired office and suspended for a day without pay." (Second EEOC Charge.) On September 19, 2007, Plaintiff filed an Amended Charge of Discrimination, expanding her Second EEOC Charge to allege that, among other things, she was denied "overtime pay" while she was assigned to the Narcotics Division. (Am. to Second EEOC Charge.)

As an initial matter, the discrimination in denial of overtime claim in the amendment to Plaintiff's second EEOC charge, occurring while she was assigned to the Narcotics Division, does not grow out of the subject matter of the second charge.   29 C.F.R. § 1601.12(b).  The conduct alleged in the second charge occurred between August 28, 2006 and October 26, 2006, four months after Plaintiff was transferred out of the Narcotics Division. (Def.'s Ex. No. D 421.)   Thus, Plaintiff's denial of overtime claim is time-barred unless the Court finds that it is reasonably related to the discriminatory conduct alleged in her first EEOC charge.

The EEOC charge "should be liberally construed to encompass all charges 'reasonably expected to grow out of the charge of discrimination.'" Haithcock v. Frank, 958 F.2d 671, 675 (6th Cir.1992). Thus, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Davis, 157 F.3d at 463. Courts are apt to find that the complaint relates to the EEOC charge where the plaintiff had merely failed to recognize a procedural technicality, distinguish between seemingly identical legal theories, or articulate the exact wording required in a judicial pleading. Haithcock, 958 F.2d at 675.

However, courts draw a distinction between a failure to

allege a specific legal claim and a failure to allege specific factual predicates. See McFagdon v. Fresh Market, Inc., No. 05-2151-D/V, 2005 WL 2768996, at *5 (W.D. Tenn. Oct. 21, 2005) ("[G]enerally . . . [c]ourts can expect the EEOC to identify and investigate legal issues that flow from the plaintiff's factual allegations. However, this should not be misinterpreted to automatically mean that claims sharing the same subject matter (i.e., age discrimination), but different factual predicates, are 'reasonably related.'") (citing E.E.O.C. v. McCall, 633 F.2d 1232, 1236 (6th Cir. 1980)). A complainant is expected to specify each event in her EEOC charge which she feels was a result of unlawful discrimination. Vinson, 806 F.2d at 688 ("It does not constitute an unjustifiable burden on claimants to require them to specify each . . . event" or "identif[y] that conduct which [he or she] felt was the result of . . . discrimination."). For this reason, courts have found that a plaintiff's failure to specifically allege discriminatory conduct in the EEOC charge barred plaintiff from bringing that claim. See, e.g., Moore v. Boeing Co., No. 4:02CV80 CFP, 2004 WL 3202777, at *5 (E.D. Mo. March 31, 2004) (dismissing the plaintiff's argument that alleging discrimination in compensation in the EEOC charge was reasonably related to her later claim of discrimination in denial of overtime; nothing in the plaintiff's EEOC charge would put the defendant on notice

that she was complaining that she received fewer overtime
assignments than her male co-workers).[13]

Plaintiff's untimely allegation that she was denied
overtime is not reasonably related to her allegation that she
was denied enforcement duties, such that SCSO would have been
put on notice of this claim.[14]  <u>Davis</u>, 157 F.3d at 463 (noting
that the exhaustion requirement notifies potential defendants of
the nature of the plaintiff's claims and provides them with the
opportunity to settle claims before the EEOC rather than
litigate them). Though Plaintiff states that the performance of
enforcement duties is how officers get overtime in the Narcotics
Division, she offers no competent evidence to support this

---

[13]   <u>See also</u> <u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62, 84 (2d Cir.
2001) (holding that plaintiff's overtime claim was not reasonably related to
plaintiff's allegation in her administrative complaint of sexual harassment;
the overtime claim bore "no factual or legal relation to the [sexual
harassment] allegations in the EEOC charge and would not naturally be
addressed in the course of an EEOC investigation into such [sexual
harassment] allegations."); <u>Coon v. Georgia Pacific Corp.</u>, 829 F.2d 1563,
1569 (11th Cir. 1987) (barring plaintiff from bringing claim related to
hiring, job assignments, layoff, recall, and discharge where the plaintiff's
EEOC charge of discrimination merely alleged wrongful denial of promotion);
<u>Johnson v. Milwaukee School of Engineering</u>, 258 F. Supp. 2d 896, 905 (E.D.
Wis. 2003) (holding that Plaintiff's Title VII claims that he was denied
overtime could not be maintained as such claims were not mentioned in his
EEOC charge, it was not like or reasonably related to the claims in his
charge, and it was outside the scope of his charge); <u>Mack v. W.R. Grace</u>, 578
F. Supp. 626, 632 (N.D. Ga. 1983) (discrimination with regard to salary,
promotions and training was not so obviously related to discriminatory
discharge claims raised before Equal Employment Opportunity Commission that
they could be raised in subsequent Title VII suit).
[14]   29 C.F.R. § 1601.12(b) provides that "<u>a charge</u>" can be amended "to
clarify or amplify allegations made therein"  and, provided the amendment
relates to "<u>the subject matter</u> of <u>the original charge</u>," it  will "relate back
to the date <u>the charge</u> was first received." (emphasis added) The plain text
of the regulation, through its use of the definite article, indicates that an
amendment corrects the deficiencies in the charge that it amends, not any
previous charges.  Consequently, the denial of overtime claim stated for the
first time in the amendment to Plaintiff's second charge may not be used to
clarify or amplify allegations made in Plaintiff's first charge.

assertion. In fact, the overtime reports that Plaintiff filed show that she received twenty-five hours of overtime between June 26, 2005 and March 5, 2006 for such tasks as "Mandatory Meeting," "Payroll/State Cases," "Fed Crt," and "Ext Duty." (Division Overtime Detail Reports (D.E. 82) 1, 75.)  This evidence contradicts Plaintiffs assertion and demonstrates that overtime in the Narcotics Division is earned in numerous ways, not just on special details and enforcement duties. Plaintiff's conclusory allegation that the two claims are essentially identical is insufficient to permit Plaintiff to avoid the exhaustion requirements of Title VII.[15]

The Court finds that Plaintiff's discrimination in the denial of overtime claim cannot be maintained; it is time-barred because it was raised more than 300 days from its occurrence. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as it relates to Plaintiff's discriminatory denial of overtime claim.

### B. Title VII Sex Discrimination Claim

Title VII of the Civil Rights Act of 1964 makes it "an

---

[15]    For these same reasons, Plaintiff's allegations that she was discriminated against when she was "called upon" to organize office events and clean the office are similarly time-barred. These allegations are not reasonably related to the discriminatory conduct alleged in the First EEOC Charge.  Even if these claims were not time-barred, however, Plaintiff does not properly raise a jury question with regard to the allegations.  These were activities she admits she voluntarily undertook. They do not constitute a "materially adverse change in the terms and conditions of employment." White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795-96 (6th Cir.2004).  Moreover, Plaintiff has also failed to establish that male officers were treated more favorably than she in this regard.

unlawful employment practice for an employer . . . to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin."  42 U.S.C. § 2000e-2(a)(1).

In order to establish a prima facie claim of sex
discrimination, Plaintiff must offer evidence showing that (1)
she was a member of a protected class; (2) she was subjected to
an adverse employment action; (3) she was qualified for the
position; and (4) she was replaced by a person outside the class
or that a "comparable non-protected person was treated better."
Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992)
(quotation marks omitted); see also McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 803 (1973).

Defendant argues that Plaintiff has failed to establish the
second and fourth prong of a prima facie case——she failed to
show that she suffered an adverse employment action and failed
to identify a male sergeant who was treated more favorably than
she.[16] (Def.'s Mem. 13, 16.)  Plaintiff counters that the
following events/conduct constitute materially adverse acts of
discrimination based on her sex: (1) being denied enforcement
duties while in the Narcotics Division; (2) being denied
training opportunities while in the Narcotics Division; (3)

---

[16]    Defendant does not dispute that Plaintiff is a member of a protected
group and was qualified for her position(s) with SCSO.

being denied adequate supervisory assistance while in the
Narcotics Division; and (4) being involuntarily transferred to
the Detectives Division.[17]

In order to satisfy the fourth prong of a prima facie
claim, a plaintiff must put forth sufficient facts to show that
she was replaced by a person outside her protected group or that
similarly situated employees outside the protected class "were
treated differently . . ., not simply that plaintiff's
circumstances were unique." Jackson v. City of Columbus, 194
F.3d 737 (6th Cir. 1999); see also Policastro v. Northwest
Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002).

In order to satisfy the second prong, Plaintiff must put
for the sufficient facts to show that she was subjected to an
adverse employment action. In the Sixth Circuit, "employment
actions that are de minimis are not actionable under Title VII."
White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795-96
(6th Cir. 2004)(quoting Bowman v. Shawnee State Univ., 220 F.3d
456, 462 (6th Cir. 2000)).  "To prevent lawsuits based upon
trivial workplace dissatisfactions, the Sixth Circuit requires a
plaintiff prove the existence of an 'adverse employment action'
to support a Title VII claim." Id. (quoting Hollins v. Atl. Co.,
188 F.3d 652, 662 (6th Cir. 1999)).  An "adverse employment

---

[17]    Plaintiff also alleges that she was referred to as the "sergeant over
the secretaries" and compared to a "dog with a problem" while in Narcotics
Division.  "[P]etty slights" and "trivial harms" are not actionable under
Title VII.  Burlington N., 548 U.S. at 68.

action" is defined as a "materially adverse change in the terms
and conditions of employment." Id.  Such a change usually
includes "a decrease in wage or salary, a less distinguished
title, a material loss of benefits, significantly diminished
material responsibilities, or other indices that might be unique
to a particular situation." Hollins, 188 F.3d at 662.  It "must
be more disruptive than a mere inconvenience or an alteration of
job responsibilities." Id.  (citation omitted). "Moreover, the
employee's subjective view of the significance and adversity of
the employer's action is not controlling; the employment action
must be materially adverse as viewed by a reasonable person in
the circumstances." Sands v. Jackson State Cmty. Coll., No. 1-
03-1333-T-An., 2006 WL 1174469, at *5 (W.D. Tenn. April 29,
2006) (quoting Davis v. Town of Lake Park Florida, 245 F.3d
1232, 1239 (11th Cir. 2001)).

     With regard to Plaintiff's charge of discrimination in the
denial of training, Plaintiff has put forth no evidence from
which a jury could conclude that a male sergeant in Narcotics
received training opportunities that she was purportedly denied.
Virostek v. Liberty Township Police Dept., 14 F. App'x 493 (6th
Cir. 2001) (upholding summary judgment in favor of defendant on
the plaintiff's claim of unequal training opportunities because
she failed to produce evidence showing that similarly situated
males received approval to attend training seminars that were

denied to her and she failed to specify the training for which
she requested and was denied attendance).  Similarly, with
regard to Plaintiff's allegation of discrimination in the denial
of proper supervisory process, Plaintiff has put forth no
evidence from which a jury could conclude that similarly
situated, non-protected employees were treated more favorably.
Plaintiff identifies no male sergeants in Narcotics who were
provided assistance with problem employees when she was denied.
"An employee has the burden of producing specific, substantial
evidence of disparate treatment, such that a reasonable jury
relying on that evidence could find in favor of the employee."
Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983).
Without evidence specifying similarly situated male sergeants
that received more favorable treatment, Plaintiff's conclusory
statements provide no credible and specific evidence of
disparate treatment on these claims.

    With regard to Plaintiff's claims that she was denied
enforcement duties, Plaintiff has arguably satisfied the fourth
prong of a prima facie claim by putting forth some evidence from
which a jury could conclude that, on the specified dates, male
sergeants participated in enforcement duties for which she was
denied. Nevertheless, this claim fails to create a genuine issue
of material fact because it does not amount to a materially
adverse employment action. There is no evidence that being

denied enforcement duties had any tangible impact on Plaintiff's employment.  Plaintiff's primary duties were largely administrative and, as the CM Sergeant, she admits that she was in a support position.  On each of the dates that Plaintiff identifies that she was denied enforcement opportunities, she worked a full eight hours performing her primary duties as the CM Sergeant.  Being restricted from a task that, as the CM Sergeant, Plaintiff was expected to be "available for," but which was not included in her regular duties, is not a "tangible employment action [that] constitutes a significant change in employment status . . . ." Burlington Indus. Inc. v. Ellerth, 524 U.S. 7452, 761 (1998); (Def.'s Ex. No. D454 (noting that the Case Management Sergeant is expected to be "[a]vailable for Narcotics Enforcement Duties").) Even if Plaintiff was called on to perform enforcement duties at some point during her tenure as the CM Sergeant, a mere change in her responsibilities does not amount to an adverse employment action. See Hollins, 188 F.3d at 662 (finding that an adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities") (citation omitted).  The evidence is insufficient to demonstrate that Plaintiff was subjected to an adverse employment action when she was denied the opportunity to perform enforcement duties.

Regarding the reassignment to the Detectives Division,

Plaintiff has failed to raise a genuine issue of material fact regarding whether the reassignment was an adverse employment action affecting the terms and conditions of her employment.[18] Plaintiff maintains that the reassignment from the Narcotics Division to the Detectives Division was materially adverse because: (1) her supervisory responsibility over five clerical employees in the Narcotics Division was eliminated; (2) it eliminated her benefits including a private office, and SCSO-provided take-home vehicle, fuel for that vehicle, pager, and cell phone; (3) she was assigned an "old" and "unkept" [sic] vehicle; (4) she was assigned an "oppressive caseload," which included some pending cases from transferred detective Sgt. Collier; (5) her duty hours changed to 0800-1630 with a 10-day workweek, purportedly longer hours than her position in Narcotics Division; (6) she had to account for her whereabouts at all times and she was not allowed to leave the office without someone accompanying her; and (7) she was not trained on the use of the crime scene kit issued to her or on the new computer procedures necessary to conduct investigative cases.[19]   (Am.

---

[18]    Because Plaintiff alleged that she was "swapped" with a male sergeant, she has established the fourth prong of her prima facie claim.
[19]    In her response to Defendant's Motion for Summary Judgment, Plaintiff claims, for the first time, that her "salary and employer-provided benefits were affected" by the transfer. (Pl. Resp.9.)  Plaintiff may not oppose a proper summary judgment motion by merely relying on the pleadings. Celotex, 477 U.S. at 324. Moreover, conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment. See Travelodge Hotels, Inc. v. Govan, 155 F. App'x 235, 237 (6th Cir. 2005)

Compl. 6; Pl.'s Resp. 4-5; Blackburn Interrogs. 5; First EEOC
Charge.) Plaintiff complains that she had "limited duties [and]
very little assistance . . . ." (Am. Compl. 6.)

An adverse employment action requires a loss of pay or
benefits, a detrimental change in responsibilities, a negative
change in the terms or conditions of employment, or some other
actual or unfavorable change in job status. Kocsis v. Multi-Care
Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1996). "Reassignments
and position transfers can qualify as adverse employment
actions, particularly where they are accompanied by [adverse]
salary or work hour changes." Spees v. James Marine, Inc., 617
F.3d 380, 391 (6th Cir. 2010) (citing Kocsis, 97 F.3d at 885-86)
(internal quotation marks omitted). "[E]ven if a reassignment is
not paired with a salary or work-hour change, it can nonetheless
be considered an adverse employment action where there is
evidence that the employee received a less distinguished title,
a material loss of benefits, significantly diminished material
responsibilities, or other indices that might be unique to a
particular situation." Id. (citing Kocsis, 97 F.3d at 886)
(internal quotation marks omitted). "Whether a particular
reassignment is materially adverse depends upon the
circumstances of the particular case, and 'should be judged from
the perspective of a reasonable person in the plaintiff's

---

(holding that briefs "filled with conclusory allegations . . . failed to
present sufficient evidence" to withstand summary judgment).

position, considering all the circumstances.'" Burlington N. &
Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (quoting Oncale v.
Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998)
(holding that Title VII does not create "a general civility code
for the American workplace")). It has been held that
"[t]ransfers intended to respond to and resolve an employee's
problems with another employee do not constitute adverse
employment action." Kasprzak v. DaimlerChrysler Corp., 431 F.
Supp. 2d 771, 777 (N.D. Ohio 2005) (citing Walker v. Nat'l
Revenue Corp., 43 F. App'x 800, 805 (6th Cir. 2002)).

        Lt. Hill's response to Plaintiff's complaints was to
transfer her to the Detectives Division, the unit Plaintiff was
in prior to her transfer to the Narcotics Division.  Plaintiff
presented no evidence that the reassignment from the Narcotics
Division to the Detectives Division involved a change of her
wages, benefits, or rank.  The loss of her private office and
SCSO-provided pager, cell phone, gas allowance, and take-home
vehicle merely correlated to the change in Plaintiff's job
duties due to her reassignment.  Lloyd v. City of St. Charles,
No. 4:07CV01935 JCH, 2009 WL 485078, at *5 (E.D. Mo. Feb. 26,
2009) (holding that the plaintiff's loss of his cell phone,
take-home car, and clothing allowance upon his reassignment from
Detective Bureau to Patrol Division did not constitute adverse
employment actions); O'Neal v. City of Chicago, 392 F.3d 909,

912-13 (7th Cir. 2004) (finding that, where the plaintiff was transferred and kept the same pay rank and benefits, but lost her cell phone, pager, vehicle, parking space, and schedule with open holidays and weekends, the changes fell short of an adverse employment action).  In addition, the assignment of an older vehicle does not constitute an adverse employment action. Markel v. Bd. of Regents of Univ. of Wis. Sys., 276 F.3d 906, 911-12 (7th Cir. 2002) (The denial of "'better' equipment" was "not [a] readily quantifiable loss[] Title VII was meant to redress.").

Furthermore, Plaintiff's loss of her supervisory responsibilities and her increased case load and job responsibilities are not actionable as adverse employment actions; there was no difference in base pay and benefits between the Detectives Division and the Narcotics Division, Plaintiff's rank remained the same, and Plaintiff presented no competent evidence that the position in the Detectives Division was objectively less prestigious. Freeman v. Potter, 200 F. App'x 439, 445 (6th Cir. 2006); see also Benefield v. Fulton Co., Ga., 130 F. App'x 308, 313 (11th Cir. 2005) (holding that the plaintiff's lateral transfer to a fire station and the removal of her duties and staff as an EMS Coordinator amounted to changes in work assignments, not conduct that altered the terms, conditions, or privileges of employment) (citing Gupta v. Florida Bd. of Regents, 212 F.3d 571, 578-89 (11th Cir. 2000)

(holding that a university's refusal to give a professor desired work assignments, at desired hours and locations, did not constitute an adverse employment action)).

Moreover, though a change in work hours can constitute an adverse employment action for purposes of establishing a prima facie case, the unique circumstances presented here lead the Court to conclude that the shift change was not materially adverse. Plaintiff's duty hours changed when she was reassigned to 0800-1630 with a 10-day workweek. Plaintiff alleges that her reassignment also included an increase in her work hours. (April 26, 2006 EEOC Charge; Pl.'s Resp. 4.) The weekly time records and weekly roll call report for the Narcotics Division show that Plaintiff's regular duty hours were from 0700, 0730, or 0800 to 1600 with a 5-day workweek.[20]   (Def.'s Ex. No. D470-D473.)   Thus, in both the Narcotics Division and the Detectives Division, Plaintiff's duty hours totaled eight (8) hours, but in the Detectives Division, there was a longer time between her days off.  The Sixth Circuit has held that an "inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged." Spees, 617 F.3d

---

[20]   Though the time records reflect that Plaintiff's in-time varied between 7:00 a.m. and 8:00 a.m., her out-time was 1600 or 4:00 p.m.  She recorded eight (8) total hours for each day worked, regardless of her time in, suggesting that she took longer or shorter lunch breaks depending on the time she arrived.

at 392. However, Plaintiff offers no evidence that the new
schedule was less favorable or resulted in any inconvenience.
Moreover, as Defendant correctly points out, it is inconsistent
for Plaintiff to complain that she was discriminatorily denied
overtime in the Narcotics Division and then complain that she
was discriminatorily forced to work more hours in the Detectives
Division.

Importantly, there is no evidence that the reassignment was
made for any reason other than to respond to Plaintiff's
problems in the Narcotics Division. "Transfers intended to
respond to and resolve an employee's problems with another
employee do not constitute adverse employment action." Kasprzak,
431 F. Supp. 2d at 777 (citing Walker, 43 F. App'x at 805)); see
also Moling v. O'Reilly Automotive, Inc., No. 09-1100, 2011 WL
112586 (W.D. Tenn. Jan. 13, 2011) (finding that employer's
proffered reason for the plaintiff's transfer to the only other
store in order to separate her from her supervisors about which
she had complained was not pretext for retaliation); Cromer-
Kendall v. District of Columbia, 326 F. Supp. 2d 50 (D.D.C.
2004) (holding that the plaintiff was not subjected to an
adverse employment action when employer attempted to improve the
plaintiff's work environment by transferring her to a location
away from a sergeant about whom the plaintiff had complained).
The same reasoning applies to a transfer intended to respond to

and resolve an employee's problems with her supervisors and her working conditions.  Plaintiff informed the command staff in the Narcotics Division that she was unhappy, that she could not continue to work under the same conditions, and that there were two options, i.e., she would ask for a transfer or they could transfer her out of the division. The command staff acted on Plaintiff's complaints and suggestion, and transferred her to the Detectives Division, the unit she was in prior to arriving in Narcotics and, importantly, the unit she testifies that she was happy in prior to her transfer.

The Court finds that Plaintiff has failed to offer evidence which would allow a reasonable jury to conclude that she was demoted by her reassignment to the Detectives Division. Though Plaintiff felt that the Detectives Division position was "less appealing," this is not actionable under Title VII.  An "employee's subjective impressions as to the desirability of one position over another are not relevant," Policastro, 297 F.3d at 539, and a "'bruised ego' is simply not enough to constitute an adverse employment action." Mitchell, 389 F.3d at 182. Plaintiff's reassignment to Detectives Division was not an adverse employment action because it involved no change in pay, rank, or benefits.  Moreover, it was intended to respond to and resolve Plaintiff's problems with her supervisors and working conditions in the Narcotics Division.  The Court finds that

Plaintiff failed to present evidence of adverse treatment sufficient to survive summary judgment on this basis. Therefore, Plaintiff having failed on this essential element of her claim, Defendant's motion for summary judgment on this claim is GRANTED.

### C. Title VII Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). In the absence of direct evidence of retaliation, courts analyze Title VII retaliation claims at the summary judgment stage using the McDonnell Douglas burden-shifting framework. McDonnell Douglas, 411 U.S. at 802; see also Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 544 (6th Cir. 2008). After the plaintiff demonstrates a prima facie case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not its true motivation, but rather, a pretext for discrimination. Id.; see also Singfield v. Akron Metro. Hous.

<u>Auth.</u>, 389 F.3d 555, 565 (6th Cir. 2004). As with Plaintiff's
sex discrimination claim, because she has not established a
prima facie case, the remaining stages of the analysis as to the
Title VII claim are unnecessary.

To establish a prima facie case of retaliation, Plaintiff
must show the following: (1) she engaged in a protected
activity[21]; (2) the defendant knew she engaged in the protected
activity; (3) the defendant subsequently took an adverse action
against her; and (4) there was a causal connection between the
protected activity and the adverse action. <u>Singfield</u>, 389 F.3d
at 565.  Alternatively, Plaintiff can establish a prima facie
case by proving that she was "subjected to severe or pervasive
retaliatory harassment by a supervisor" and that there was a
causal connection between the protected activity and the
harassment. <u>See</u> <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d
784, 792 (6th Cir. 2000).

Plaintiff maintains that the SCSO retaliated against her
for her EEOC charges.  The parties' dispute centers on the
presence of an adverse employment action and causation.
Plaintiff identifies the following retaliatory actions taken by
the SCSO as adverse: (1) shunned by co-workers and the
administration staff while in the Detectives Division; (2)
reassigned to the Criminal Courts Division; (3) an unjust

---

[21]    Defendant does not dispute that Plaintiff engaged in protected activity
when she filed complaints with the EEOC.

disciplinary action; (4) termination of her EAP benefits; (5) denial of her transfer requests; (6) a low performance evaluation; (7) unjust damage to her personnel file; (8) exclusion from training; and (9) unfair and unjust treatment by Lt. Hill, including constant criticism and reprimands which created an abusive and hostile work environment.[22]

### 1. Adverse Employment Action

Not every employment action disliked by an employee is sufficient to satisfy the adverse action element of the retaliation claim. The standard for whether an act of retaliation rises to the level of material adversity is an objective one, requiring a showing that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68 (citation and internal quotation marks omitted). In the Sixth Circuit, "de minimis employment actions are not materially adverse and, thus, not actionable." Bowman, 220 F.3d at 462. The Supreme Court has limited "adverse

---

[22]    The Court will not consider whether Plaintiff's transfer to the Narcotics Division on April 22, 2006 was an adverse retaliatory action because the transfer occurred prior to the date of Plaintiff's First EEOC charge.  Moreover, the First EEOC charge references the transfer and, importantly, does not allege a retaliation claim. Duggins v. Steak 'N Shake, Inc., 195 F.3d 828, 832 (6th Cir. 1999) ("If an EEOC charge does not properly allege a retaliation claim, the court only has jurisdiction over retaliation arising as a result of filing the EEOC charge itself.") As a result, it is factually impossible for Plaintiff to establish the necessary causal connection between the protected activity and the alleged retaliatory reassignment.

employment actions" to something more than "petty slights, minor annoyances, and simple lack of good manners." Burlington N., 548 U.S. at 68.

The Court finds that Plaintiff has failed to demonstrate that she was subjected to an adverse employment action in retaliation for her protected conduct.  Plaintiff's allegations that she was shunned by co-workers after her reassignment to the Detectives Division, even if true, is not sufficient to show a retaliatory adverse employment action. Burlington N., 548 U.S. at 68 (explaining that "petty slights," "minor annoyances," and "snubbing" by supervisors and co-workers is not actionable under Title VII).

The reassignment to the Courts Division is also insufficient to establish an adverse action.  Plaintiff requested a reassignment out of the Detectives Division, which was granted.  Though Plaintiff claims that the Courts Division was a "punishment area," she does not allege that she suffered a change in pay, benefits, seniority, rank, or job status as a result of her assignment to the Courts Division.  The Sixth Circuit, in discussing what amounts to materially adverse reliatory conduct, noted that a reassignment, a negative public perception concerning a transfer or a particular job, a transfer to a position with different responsibilities, semantic changes in title, and the bruising of an ego did not, without more, rise

to the level of "materially adverse changes" in the terms of
employment. <u>Kocsis</u>, 97 F.3d at 885-87. This is true even if the
employment action has the effect of making the plaintiff's job
more difficult. <u>See</u> <u>id.</u> at 885.  Moreover, "[a]n employee's
subjective impressions as to the desirability of one position
over another are not relevant." <u>Id.</u>  Though Plaintiff was
unhappy with the assignment, she requested the transfer and
admits that there were some officers who preferred assignment to
the Courts Division.  A reasonable employee would not have found
this reassignment to be materially adverse nor would have been
dissuaded from bringing complaints under Title VII on the basis
of the reassignment.

Likewise, the disciplinary action is insufficient to
establish an adverse employment action.  Although the record
indicates that the disciplinary action resulted in the
recommendation of a one-day suspension without pay, this one-day
suspension without pay was never served. <u>Virostek</u>,  14 F. App'x
at 503-504 (upholding summary judgment in favor of defendant on
plaintiff's retaliation claim; though investigation resulted in
recommendation of one-day suspension without pay, this one-day
suspension was never served and plaintiff testified she had not
"suffered any loss as a result"); <u>Jackson</u>, 194 F.3d at 752
(holding that a police chief's suspension *with* pay was not an
adverse employment action); <u>see also</u> <u>Whittaker v. N. Ill. Univ.</u>,

424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay that is never served does not constitute an adverse employment action.").

Similarly, the low performance evaluation and purported "damage" to Plaintiff's personnel file are insufficient to establish an adverse employment action.  In general, "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact an employee's wages or salary."  Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 322 (6th Cir. 2007).  "Thus, to characterize a negative performance evaluation as an adverse employment action 'the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation.'"  White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Morris, 201 F.3d at 789)).  Plaintiff offered no evidence that the performance evaluation or the contents of her personnel file resulted in a tangible adverse employment action.

Plaintiff's allegations that she was denied training in retaliation for her protected conduct similarly fail to establish an adverse employment action.  The denial of training that has no adverse impact on a plaintiff's growth, advancement, or compensation fails to rise to the level of an adverse employment action.  Johnson-Romaker v. Kroger Ltd. P'ship One,

609 F. Supp. 2d 719, 725 (N.D. Ohio 2009); Freeman, 200 F. App'x
at 442 (material adverse change includes diminished
opportunities for advancement). Though Plaintiff testified that,
after she filed her EEOC charge, the amount of training that she
received declined (April Dep. 85), she has produced no competent
evidence in support of this claim.  Plaintiff admitted that,
after she was transferred to the Courts Division, she never
requested training and had her request denied and that, during
the relevant time period, she never sought a promotion that she
did not receive.  (Pl.'s Resp. to Def.'s UMF ¶ 62; March Dep.
29.)  Moreover, Defendant produced evidence demonstrating that
Plaintiff attended a 40-hour specialized law enforcement course
in February 2007 and courtroom security training in 2008.
(Def.'s Ex. No. D207; Def.'s UMF ¶ 61.)  Based on this record,
the Court finds that the denial of training opportunities was
not materially adverse because Plaintiff has produced no
evidence of training that she was denied or otherwise had a
tangible adverse impact on her growth, advancement, or
compensation.

Regarding the termination of Plaintiff's EAP benefits,
Plaintiff alleges that her benefits were terminated because she
refused to release information regarding her sessions to the
SCSO.  (Blackburn Interrogs. 8.)  Defendant produced evidence,
however, demonstrating that Plaintiff's authorization for

treatment by Dr. Cox was suspended because of Plaintiff's refusal to sign the authorization for treatment. (Def.'s Ex. No. D197-D199.)  Even if the suspension of Plaintiff's benefits under these circumstances could be considered materially adverse, Plaintiff has put forth no evidence demonstrating that Defendant's proffered justification is pretext. "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false and that discrimination was the real reason." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804-05 (6th Cir. 1994) (citing Hicks, 509 U.S. at 515)). "[M]ere personal belief, conjecture, and speculation are insufficient." Woythal v. Tex-Tenn. Corp., 112 F.3d 243, 247 (6th Cir. 1997).  Plaintiff offers no competent evidence demonstrating that Defendant's proffered justification for the suspension of Plaintiff's termination was pretext, aside from her own personal belief.  Accordingly, since Plaintiff failed to establish pretext, her retaliation claim based on this conduct cannot survive summary judgment.

In addition, Plaintiff has not demonstrated that the denials of her requests for reassignment were adverse employment actions.  "[A] purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes." See Kocsis, 97 F.3d at 886.  Plaintiff alleges that

her requests for reassignment out of the Criminal Courts
Division were denied in February 2007 (request to transfer out
of the Courts Division denied because no one else wanted her),
July 2007 (denial to work Special Detail FSS), October 4, 2007
(denial to work Special Detail FSS), October 2007 (transfer
request denied because of Plaintiff's performance evaluation and
attendance record), and June 2008 (request for reassignment to
FBI Task Force denied because the SCSO never received funding).
Though Plaintiff contends that these denials were retaliatory
and in response to her EEOC Charges, she offers no evidence that
a reassignment would have resulted in an increase in rank, pay,
or benefits. Rather, she indicates that she was unhappy in the
Courts Division and, in her opinion, she would be "better
utilized within another division . . . that would also allow for
further career opportunities." (Def.'s Ex. No. D227.)
Plaintiff's "subjective impressions as to the desirability of
one position over another are not relevant" in determining
whether the employee suffered an adverse employment action.
Momah v. Dominguez, 239 F. App'x 114, 123 (6th Cir. 2007)
(quoting Policastro, 297 F.3d at 539). Moreover, "a refusal to
grant a change requested by an employee is not an adverse
employment action unless the employee has a right to the
requested change by law or through the terms and conditions of
his employment." Barrett v. Lucent Technologies, Inc., 36 F.

App'x 835, 842 (6th Cir. 2002) (citing Randless v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (plaintiff showed that transfer was a common practice and so arguably a "privilege" of employment)).  Plaintiff offered no evidence that she had a right to a transfer out of the Court Division; rather, she admits that, pursuant to the SCSO's policy, transfers are within the discretion of the SCSO.  (April Dep. 38.)  Plaintiff's allegation that she was denied reassignment out of the Courts Division in retaliation for her protected conduct fails to establish an adverse employment action because she has produced no competent evidence that a refusal to reassign her resulted in a tangible detriment to her employment with the SCSO or that she had a right to reassignment.

## 2. Severe or Pervasive Harassment by a Supervisor

A plaintiff may also establish a prima facie case by showing that her protected activity caused her to be severely or pervasively harassed by a supervisor.  Morris, 201 F.3d at 792. The Sixth Circuit has held that "the standard for severe or pervasive harassment is the same in the retaliation context as in the sexual and racial discrimination contexts." Akers v. Alvey, 338 F.3d 491, 498 (6th Cir. 2003) (internal citations omitted). That standard requires the plaintiff to show that "the workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment . . . ." Harris
v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); see also Morris,
201 F.3d at 790.

      "In determining whether the conduct is severe or pervasive
enough to constitute a hostile work environment, [the] court
must consider the totality of the circumstances an employee
faces, including 'the frequency of the . . . conduct; its
severity; whether it is physically threatening or humiliating,
or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance.'" Broska v.
Henderson, 70 F. App'x 262, 269 (6th Cir. 2003) (quoting Harris,
510 U.S. at 23). It is not "whether each incident or harassment
standing alone is sufficient to sustain the cause of action in a
hostile environment case, but whether——taken together——the
reported incidents make out such a case." Williams v. General
Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999).

      "Thus, [the Court must] look both to whether a reasonable
person in plaintiff's position would find that the conduct at
issue constitutes severe or pervasive hostile retaliation and
whether the plaintiff subjectively perceived the employer's
actions to be severe or pervasive retaliation." Ceckitti v. City
of Columbus, Dept. of Public Safety, Div. of Police, 14 F. App'x
512, 516-17 (6th Cir. 2001)(citing Harris, 510 U.S. at 21).
"Conduct that is not severe or pervasive enough to create an

objectively hostile or abusive work environment——an environment
that a reasonable person would find hostile or abusive——is
beyond Title VII's purview." Id. (quoting Harris, 510 U.S. at
21). "'[S]imple teasing,' offhand comments, and isolated
incidents (unless extremely serious) will not amount to
discriminatory changes in the 'terms and conditions of
employment.'" See Faragher v. City of Boca Raton, 524 U.S. 775,
788 (1998) (internal citations omitted).

Plaintiff alleges that she was harassed by Lt. Hill in
retaliation for her EEO complaints. Specifically, Plaintiff
alleges that, shortly after her transfer to the Courts Division
in August 2006, Lt. Hill began to treat her unfairly and that
his conduct created an abusive and hostile work environment: he
instructed her to put her gun belt back on after she removed it
to clean under her desk, he raised his voice and unjustly
chastised her during a meeting, he accused her of being
unprofessional, he made her call in sick every day for the
duration of her FMLA sick leave when this policy was not
enforced with others, he instructed Plaintiff not to call him
"sir," and he told Plaintiff he would not meet with her in
private.[23] According to Plaintiff, Lt. Hill and Capt. Yarbrough[24]

---

[23]     In her interrogatory responses, Plaintiff also states: "From August 30,
2006 to October 2, 2006 other Sergeants are allowed to leave work early with
out [sic] being charged time (12:00-12:30 daily) Approved [sic] time off that
interpreted duties." (Id.) Plaintiff does not explain this allegation nor
allege that her compensation was unjustly reduced when she left work early.

"just looked for things . . . for stupid things all day long to
needle [her] with, to call [her] on the carpet about . . . silly
things that <u>don't mean nothing</u>." (April Dep. 171 (emphasis
added).)  Plaintiff's complaints of harassment also include the
disciplinary action, the denial of her transfer requests, her
low performance evaluation, the adverse letters placed in her
personnel file, and exclusion from training.[25]

Having reviewed the record, the Court finds that Plaintiff
fails to point to sufficient evidence in the record to create a
genuine issue of material fact regarding whether she was
harassed due to protected activity.  When considering the
conduct to which Plaintiff points, it is not sufficiently severe
or pervasive to support a claim for retaliatory harassment.

Plaintiff describes isolated incidents over the course of
approximately eighteen months and points to generalized
complaints of constant needling and criticism.[26]  This conduct

The Court declines to interpret this allegation without any evidence from
Plaintiff demonstrating how it supports her claim of retaliatory harassment.
[24]     Plaintiff also suggests that she suffered retaliatory harassment from
Capt. Yarbrough, though the allegations are unspecific and generally overlap
with the alleged retaliatory adverse actions she experienced in the Courts
Division.  When she filed her grievance, she did not indicate that the
harassment was from Capt. Yarbrough.  She did testify, however, that when
Capt. Yarbrough was transferred to the Civil Courts Division in 2009, he
resumed harassing her.
[25]     The other purported retaliatory conduct alleged by Plaintiff, i.e.,
termination of her EAP benefits, was not an action taken by Lt. Hill or Capt.
Yarbrough.
[26]     Almost one year after Plaintiff filed her third, and final, EEOC
charge, Plaintiff discovered an allegedly derogatory letter in her human
resources file from Sergeant Fred Banks. (Blackburn Interrogs. 10.)
Plaintiff states that the letter confirmed her suspicions that she was being
watched and monitored at all times. (March Dep. 197-99.)  The letter, dated

had no tangible, cumulative effect on her employment status.
Plaintiff has never had her pay docked, been denied a promotion,
been down-graded in rank, or otherwise been denied an
opportunity for advancement within the SCSO.  Regarding the
disciplinary action and resulting letters in her personnel file,
Plaintiff requested the investigation, a full investigation
commenced, and Plaintiff's actions, whether justified or not,
have never resulted in a loss of pay or rank.  Likewise, though
she complains that her training decreased, and appears to object
that she was never approached regarding training, Plaintiff
admits that she never requested training that she was denied.
Though Plaintiff complains of a low performance evaluation, she
admits that in June 2007, after the disciplinary action from Lt.
Hill and during the time she was allegedly experiencing
retaliatory harassment, Lt. Hill gave Plaintiff a positive
review in which "he was singing [her] praises as a supervisor."
(April Dep. 119.) This intervening act weakens any causal
connection between these alleged retaliatory incidents and

---

August 17, 2009, states that Plaintiff took two deputies to lunch on August
17 and 18, 2009, while they were working overtime. (Def.'s Ex. No. D455.)
Plaintiff does not dispute the factual accuracy of the letter. Also in August
2009, Capt. Hill, after receiving a promotion from the rank of lieutenant,
was reassigned to the Courts Administrative Staff.  After discussing a
transfer with Plaintiff, Capt. Hill transferred Plaintiff to the Court
Coordinators Office.  To the extent that Plaintiff asks the Court to consider
this conduct as evidence of retaliatory harassment, the Court declines to do
so.  The purportedly derogatory letter was not from Lt. Hill or Capt.
Yarbrough.  Moreover, Plaintiff does not claim that Lt. Hill transferred her
with a retaliatory motive, and there is no evidence of a causal connection
between the transfer and Plaintiff's EEOC complaints filed almost one year
earlier.

undermines Plaintiff's claim that Lt. Hill's conduct was sufficiently or pervasive to alter the conditions of her employment.

Moreover, though Plaintiff complains that she was denied reassignment out of the Courts Division in retaliation for her EEOC charges, Plaintiff admits that Lt. Hill, her direct supervisor and the alleged primary offender, did not prevent her from being transferred out of the Courts Division. (Pl.'s Resp. to Def.'s UMF ¶ 84.) In fact, Plaintiff admits that Lt. Hill requested that she be transferred out from under his command as a protective measure following Plaintiff's notification that she intended to file a complaint alleging a hostile work environment. (Def.'s Ex. No. D184.) In addition, Plaintiff's complaints regarding reassignment are inconsistent; she complains that some of her requests for reassignment were denied, but also complains that other requests were granted.

Regarding the other instances—where Lt. Hill instructed Plaintiff to put on her gun belt and directed her to call in sick during her FMLA leave—these involve Lt. Hill enforcing SCSO policies. Plaintiff offers no competent evidence that these policies were selectively enforced against her in retaliation for her protected conduct. Furthermore, she provides no evidence, other than her own opinion, that these instructions were unfair, unjust, or abusive.

The remaining instances of purported criticism and unfair treatment by Lt. Hill are best characterized as "ordinary tribulations of the workplace," which are not actionable under Title VII. See Broska, 70 F. App'x at 270 (finding purported retaliatory harassment not sufficiently severe or pervasive where employee claimed that supervisors continually monitored him and subjected his work to criticism). As noted above, "offhand comments, and isolated incidents," do not constitute a hostile environment under Title VII. Faragher, 524 U.S. at 788 (internal citation omitted). Title VII was not meant to be, and courts must ensure that it does not become, a "general civility code." See id. at 788 (citation omitted). "Not everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir.1996) (internal quotations and citation omitted). Conduct that a reasonable person would find neither hostile nor abusive is beyond Title VII's purview. See Harris, 510 U.S. at 21. The Supreme Court established these standards "to ensure that Title VII does not become a general civility code." Faragher, 524 U.S. at 788.

The Sixth Circuit has found that allegations similar to those that Plaintiff makes are insufficiently severe or

pervasive to support a claim for retaliatory harassment under
Title VII.  See Broska, 70 F. App'x at 270 (supervisor ignored
employee, encouraged coworkers to do the same, criticized her
work, and withheld her mail); Diamond v. U.S. Postal Service, 29
F. App'x 207, 213 (6th Cir. 2002) (supervisors unjustifiably
threatened employee with discipline); see also Baker v. City of
Toledo, Ohio, No. 3:05 CV 7315, 2007 WL 1101254, at *9 (N.D.
Ohio April 11, 2007)(employee was required to take training on
personal time, request a shift change in writing, denied access
to the Chief, given a negative evaluation, and given a traffic
citation all over the course of one year). Where the Sixth
Circuit has found retaliatory harassment to be sufficiently
severe or pervasive, the allegations were far more serious than
those in the instant case. See Morris, 201 F.3d at 793
(supervisor called employee on the telephone over thirty times
to harass her, sat outside her office making faces at her,
followed her home from work and made an obscene gesture at her,
destroyed a television she watched at work, and threw roofing
nails onto her home driveway on several occasions); Jordan v.
City of Cleveland, 464 F.3d 584, 598-99 (6th Cir. 2006) (senior
firefighter was made to do menial and dirty chores usually
reserved for junior firefighters, was denied "acting time," was
detailed to stations where he was the junior or only black
firefighter, was belittled and branded as "difficult," had his

gear stuffed into a basketball hoop and torn, and faced
confrontation and threats not to take his complaints to his
superiors).

A D.C. Circuit case, Hussain v. Nicholson, is also
instructive. 435 F.3d 359 (D.C. Cir. 2006). In Hussain, the D.C.
Circuit found the plaintiff failed to make a showing that he was
subjected to retaliatory harassment based upon several alleged
retaliatory acts, including: (1) another employee's appointment
as permanent Chief of Radiation Therapy, (2) heightened
monitoring by supervisors, (3) poor performance evaluations, (4)
delay in forwarding retirement application forms, (5) denial of
counsel during a discussion about retirement and failure to
provide a written copy of retirement options, (6) denial of
access to his personnel file, (7) termination threats, and (8)
failure to address insubordination by other employees. Id. at
366. Though noting that the plaintiff's work environment was
"hardly ideal," the court concluded that "no reasonable jury
could find it 'abusive' . . . ." Id. at 367.

The instant case is similar. Though Plaintiff's work
environment in the Courts Division may not have been ideal,
Title VII is not meant to be a "general civility code."
Faragher, 524 U.S. at 788 (internal citation omitted). Though
Plaintiff may have subjectively believed that she was subject to

retaliatory harassment,[27] the Court concludes that no reasonable jury could find that that the actions of Lt. Hill and Capt. Yarbrough were were in retaliation for Plaintiff's EEOC charges or were sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.[28]  In Plaintiff's own opinion, the harassing conduct generally involved "needl[ing] her" over "silly things that [meant] nothing." (April Dep. 171.)  The Sixth Circuit has repeatedly held that minor irritations simply do not amount to severe or pervasive harassment. See, e.g., Broska, 70 F. App'x at 269 (citing cases).

Because Plaintiff has failed to demonstrate either a sufficient retaliatory action or severe or pervasive retaliatory harassment by a supervisor, she has failed to demonstrate a prima facie retaliation case.  Accordingly, Defendant's Motion

---

[27]   Plaintiff's subjective view that Lt. Hill's conduct was hostile or abusive, i.e., whether she subjectively perceived Lt. Hill's actions to be severe or pervasive retaliation, is doubtful.  Plaintiff testified that, prior to receiving the disciplinary action in October 2006, she had never filed an internal complaint with the SCSO because, prior to that time, she had never been subjected to a hostile work environment. (April Dep. 104-05.)  Thus, Plaintiff's testimony indicates that she did not subjectively view the gun-belt incident on August 31, 2006 and the October 9, 2006 meeting in which Lt. Hill chastised her and accused her of being unprofessional as severe or pervasive retaliation.  Moreover, she characterized the daily criticism and purportedly harassing conduct of Lt. Hill as "needl[ing]" her about "stupid" and "silly" things that meant "nothing."

[28]   There are additional problems with the causal connection between Lt. Hill and Capt. Yarbrough's purported retaliatory harassment and Plaintiff's EEOC complaints.  Plaintiff admits that Lt. Hill and Capt. Yarbrough never said anything to her about her EEOC complaints or made a statement that led her to believe that they did not like the fact that she had filed EEOC complaints.  (April Dep. 45; March Dep. 205-06.)

for Summary Judgment is GRANTED as it relates to Plaintiff's
claim of retaliation.

### D. Title VII Hostile Work Environment Based on Sex Claim

"In order to establish a prima facie case of hostile work
environment based on sexual harassment, plaintiff must show by a
preponderance of the evidence: (1) that she was a member of a
protected class; (2) that she was subjected to unwelcome sexual
harassment; (3) that the harassment was based on sex; (4) that
the harassment unreasonably interfered with her work performance
by creating a hostile, offensive, or intimidating work
environment; and (5) that there is a basis for employer
liability." Thornton v. Federal Exp. Corp., 530 F.3d 451, 455
(6th Cir. 2008) (citing Hafford v. Seidner, 183 F.3d 506, 512
(6th Cir. 1999)).

Defendant takes issue with the fourth element, contending
that Plaintiff has not established that the alleged harassment
was severe or pervasive enough to create a hostile work
environment.[29] (Def.'s Mem. 21-22.)

The same standards by which the Court analyzes Plaintiff's
retaliatory harassment claims apply to Plaintiff's hostile work
environment claim. Akers, 338 F.3d at 498 (holding that "the

---

[29]     Defendant's arguments refer to Plaintiff's inability to establish
conduct that constituted a discriminatory change in the terms and conditions
of employment. (Def.'s Mem. 21-22.) The facts to which Defendant refers,
however, challenge Plaintiff's ability to establish the third prong of her
prima facie claim. (Id. at 21.)

standard for severe or pervasive harassment is the same in the retaliation context as in the sexual and racial discrimination contexts"); (see supra part IV.B.2.)

In support of her sexually hostile work environment claim, Plaintiff proffers evidence of her meeting with Capt. Yarbrough on February 27, 2008.[30]  During this meeting, Capt. Yarbrough asked Plaintiff is she wanted to be "fixed up" and if she wanted to be taken to lunch, referred to doing the "bump together" and began bumping his rear end against a desk. Though Plaintiff did not interpret Capt. Yarbrough's reference to "the bump" as referring to anything other than the dance, she states that the dance was sexual in nature, which is inappropriate for work and made Plaintiff uncomfortable. (March Dep. 52; Pl.'s Resp. to Def.'s UMF ¶ 89.)  Aside from Capt. Yarbrough's comments on February 27, 2008, he has never on any other occasion offended Plaintiff by making a sexual remark in her presence or by making a comment to her that was offensive to her as a woman. (March Dep. 46.)

---

[30]     Plaintiff also alleges that she was "made to . . . get under desks without removing her gun belt, involuntarily transferred, referred to as a secretary, compared to as [sic] a 'dog with a problem', told he [sic] was too old." (Pl.'s Resp. 9.)  This conduct is either time-barred or has already been addressed and found not actionable.  In addition, the other purported harassing conduct of which Plaintiff complains is not included in the Court's analysis of Plaintiff's sexual harassment claim because there is no evidence in the record to suggest that the conduct was committed "because of sex." See Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000) (declining to include supervisor's retaliatory conduct into the hostile work environment equation because there was no evidence that it was motivated by plaintiff's sex).

This incident fails to rise to the level of an actionable
hostile work environment because it does not evidence the type
of severe, pervasive, or extreme conduct required for a hostile
workplace claim.   It was a single, isolated instance of
harassment, not the type of ongoing harassment that the Sixth
Circuit has held to be actionable. See, e.g., Clark v. United
Parcel Serv., Inc., 351-52 (6th Cir. 2005) (holding that three
instances of harassment over a period of approximately two-and-
a-half years were insufficient to be severe or pervasive, but
that seventeen instances during the same time period were
sufficient to reverse the district court's grant of summary
judgment in favor of the defendant).   The statements were merely
"offensive utterances" without any "physical invasion" of
Plaintiff's person. Hawkins v. Anheuser-Busch, Inc., 517 F.3d
321, 334 (6th Cir. 2008) (holding that sexual harassment
involving "physical invasion" is more serious than harassment
involving mere comments).   There is simply no evidence that the
workplace was "permeated with discriminatory intimidation,
ridicule, and insult . . . sufficiently severe or pervasive to
alter the conditions of [Plaintiff's] employment." Harris, 510
U.S. at 22 (citations and internal quotations omitted).

The Court therefore finds that no genuine issue of material
fact exists as to whether a reasonable person would find
Plaintiff's work environment objectively hostile.   Defendant's

Motion for Summary Judgment is GRANTED as it relates to Plaintiff's claim of a sexually hostile work environment.[31]

### E. Title VII Disparate Impact Claim

In her response to Defendant's motion for summary judgment, Plaintiff contends that Defendant has not properly addressed her disparate impact claim. (Pl.'s Resp. 6 n. 1.)  The only allegations Plaintiff makes in support of a disparate impact claim are in her Amended Complaint, where Plaintiff states that Defendant maintained a policy and practice of discrimination that resulted in a "disparate impact upon older female Sheriff [sic] Department employees as a whole." (Am. Compl. 12.)

To establish a prima facie case of discrimination under a disparate impact theory, the plaintiff must (1) identify "a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[] that the challenged practice has an adverse impact on a protected group." Isabel v. City of Memphis, 404 F.3d 404, 411 (6th Cir. 2005).  The "single specific practice" requirement is eliminated only in circumstances where "the elements of a respondent's

---

[31]    Plaintiff also alleges that she was subjected to a hostile work environment based on age. (Am. Compl. ¶ 5; Pl.'s Resp. 9.)  In support of her claim, Plaintiff alleges that she was told she was "too old" and denied the opportunity to perform enforcement duties.    (March Dep. 63-65; Pl.'s Resp. 4.) For the same reasons that Plaintiff's hostile work environment based on sex claim fails, Plaintiff's hostile work environment based on age fails. Plaintiff's evidence is "not severe or pervasive enough to create an objectively hostile or abusive work environment" and thus, it is "beyond the purview of the ADEA." Harris, 510 U.S. at 22 (1993); see also  Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834 (6th Cir. 1996) (examining hostile work environment under the ADEA).

decisionmaking process are not capable of separation for analysis." Phillips v. Cohen, 400 F.3d 388, 398 (6th Cir. 2005).

Plaintiff has offered no evidence of a specific employment practice of the SCSO responsible for an adverse impact on female sergeants. Avalos v. Cintas Corp., No. 06-12311, 2010 WL 1417804, at *10 (E.D. Mich. April 5, 2010) (explaining that the failure to allege a "specific employment practice" that caused an adverse effect due to the plaintiff's gender was fatal to her disparate impact claim).  Accordingly, Defendant's Motion for Summary Judge is GRANTED as it relates to Plaintiff's claim of disparate impact.

**F. ADEA Age Discrimination Claim**

Age discrimination claims under the ADEA are analyzed under the same framework as employment discrimination cases under Title VII. Policastro, 297 F.3d at 538; 29 U.S.C. § 623(a)(1). To establish a successful discrimination claim under the ADEA, Plaintiff must present either direct or circumstantial evidence of discrimination. Anthony v. BTR Automotive Sealing Sys., 339 F.3d 506, 514 (6th Cir. 2003) (citation omitted). Regardless of whether the evidence is direct or circumstantial, a plaintiff must demonstrate that she was subjected to an adverse employment action based on her age.[32] Rushton v. City of Warren, 90 F. App'x

---

[32]   Plaintiff was born on December 13, 1956. (Pl.'s Resp. to Def.'s UMF ¶ 30.) Thus, she was 48 years old in 2005 when the alleged discrimination began.  Plaintiff has presented no evidence to show that a similarly situated

912, 916 (6th Cir. 2004). Though Plaintiff generally alleges age discrimination, she offers no other evidence to support this allegation.  The only evidence Plaintiff has presented that she was discriminated against based on her age is a statement by Lt. Ducrest that Plaintiff was "too old" for enforcement duties. (March Dep. 63, 64-65; Pl.'s Resp. 4.)   Plaintiff has presented no competent evidence that she suffered an adverse employment action based on her age.[33] Thus, Plaintiff has failed to produce facts sufficient to create a jury question with regard to her age discrimination claim. Accordingly, Defendant's Motion for Summary Judge is GRANTED as it relates to Plaintiff's claim of age discrimination.

**G. THRA Claim**

Tennessee state courts have "looked to federal case law applying the provisions of the federal antidiscrimination statutes as the baseline for interpreting and applying [the THRA]." Graves v. Circuit City Stores, Inc., No. 03A01-9501-CH-00012, 1995 WL 371659, at *2 (Tenn. Ct. App. June 21, 1995)

---

younger sergeant was treated more favorably than she, nor has she identified a younger individual to whom she compares herself to establish a prima facie case of age discrimination based on circumstantial evidence. Assuming arguendo that Lt. Ducrest's statement that Plaintiff was "too old" for enforcement duties amounts to direct evidence of age discrimination, Plaintiff need not present evidence that a similarly situated individual outside the protected class was treated more favorably.  Nevertheless, she still must present evidence of an adverse employment action, which Plaintiff has not done. Rushton, 90 F. App'x at 916.

[33]   As discussed above, the SCSO's alleged denial of Plaintiff's requests to perform enforcement duties and work on special details is not an adverse employment action.

(citation omitted); see also Moling v. O'Reilly Automotive, Inc., No. 09-1100, 2011 WL 112586, at *20 (W.D. Tenn. Jan. 13, 2011) (noting that, while the Tennessee Supreme Court's decision in Gossett v. Tractor Supply Co., Inc., 320 S.W.3d 777 (Tenn. 2010), calls into question the continuing utilization of the McDonnell Douglas framework for state retaliation claims, the standard to be applied at the summary judgment stage is procedural and thus, the McDonnell Douglas analysis applied to the plaintiff's THRA retaliation claim). Therefore, for the same reasons that the Court grants summary judgment on Plaintiff's Title VII claims of sex discrimination, hostile work environment, and retaliation, and ADEA claims of age discrimination and hostile work environment, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's parallel THRA claims.

### H. Intentional Infliction of Emotional Distress Claim

Though Plaintiff does not expressly allege a claim for intentional infliction of emotional distress, Plaintiff does allege that Defendant's acts "constitute outrageous conduct" which has caused her mental anguish and emotional distress. (Am. Compl. 12.) Defendant argues that it is immune from Plaintiff's claim for intentional infliction of emotional distress under the Tennessee Governmental Tort Liability Act ("TGTLA"). (Def.'s Mem. 23-24 (citing Tenn. Code Ann. § 29-20-205(2)).) The Court

agrees.  The Sixth Circuit has held that, pursuant to the TGTLA, a municipality "is immune from suit" for claims of intentional infliction of emotional distress. <u>Blakely v. City of Clarksville</u>, 244 F. App'x 681, 683 (6th Cir. 2007); Tenn. Code Ann. § 29-20-101 <u>et seq.</u>  Accordingly, Defendant's Motion for Summary Judge is GRANTED as it relates to Plaintiff's claim of intentional infliction of emotional distress.

**I. Fourteenth Amendment Claim**

Plaintiff's Amended Complaint states that this action arises under the Fourteenth Amendment and alleges that Defendant engaged in "illegal unconstitutional acts." (Am. Compl. 1, 2.) In its Motion for Summary Judgment, Defendant argues that, to the extent that Plaintiff makes a claim under the Fourteenth Amendment, it should be dismissed for failure to state a claim. (Def.'s Mem. 22.) In particular, Defendant contends that Plaintiff's failure to seek enforcement through some legislative act, such as 42 U.S.C. § 1983, prevents Plaintiff from stating a claim for relief under the Fourteenth Amendment.  (Def.'s Mem. 22.)  The Court agrees. Moreover, Plaintiff has not offered any evidence in support of this claim nor addressed it in her response to Defendant's motion.  Accordingly, to the extent that Plaintiff has asserted a Fourteenth Amendment claim, the Court GRANTS Defendant's Motion for Summary Judgment on the claim.

**V. CONCLUSION**

Because Plaintiff has failed to establish a prima facie case on any of her claims, the Court GRANTS Defendant's Motion for Summary Judgment as to all of Plaintiff's claims. Accordingly, this case is DISMISSED WITH PREJUDICE in its entirety.  Further, the Court DENIES as moot Defendant's pending Motion to Strike (D.E. 87.)

**IT IS SO ORDERED,** this 18th day of February, 2011.

/s/ JON PHIPPS McCALLA
CHIEF UNITED STATES DISTRICT JUDGE